

## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 16, 2016 Session

### STATE OF TENNESSEE v. HEATHER YOUNG

**Appeal from the Criminal Court for Morgan County**
**No. 09-CR-9490     E. Eugene Eblen, Judge**

---

### No.  E2015-02240-CCA-R3-CD

---

The Defendant, Heather Young, was convicted by a Morgan County Criminal Court jury of first degree premeditated murder.  *See* T.C.A. § 39-13-202(a)(1) (2014).  The Defendant received a life sentence.  On appeal, she contends that the evidence is insufficient to support her conviction.  We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ. joined.

Cashauna C. Lattimore (on appeal), Knoxville, Tennessee; Joe H. Walker, District Public Defender; and Walter B. Johnson and Alfred Hathcock (at trial), Assistant Public Defenders, for the appellant, Heather Young.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Russell Johnson, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to the June 25, 2009 death of Memford Hamby, who was fatally shot while inside his house.  Morgan County 9-1-1 dispatcher Amanda Hamby[1] testified

---

[1] Ms. Hamby and Deputy Samuel Hamby, whose testimony is summarized below, testified that they were not related to the victim.

that on June 25, 2009, she answered a call from the victim, and the recording of the call was played for the jury.

In the recording, the victim breathed heavily and told the dispatcher that he had just been shot in the stomach and the leg by the Defendant, who was still present. The victim said, "It's not loaded, stupid," and told the dispatcher that the Defendant had picked up one of his guns. He stated that he thought she was "wanting to finish the job" and that he had not hurt the Defendant other than "knocking her upside . . . her head with her gun." He said that he had taken her gun away from her, that he thought she was preparing to leave, and that he would not try to stop her. The Defendant said in the background, "Tell her I'm going home to finish the job." The victim repeated the phrase and told the dispatcher that he did not know what the Defendant meant. The Defendant said, "You're going to get caught with all my pills, here?" The victim responded, "It looks like it, don't it." The Defendant told the victim to tell the dispatcher the victim was "hold[ing] my pills for ransom." The victim said, "Out the door with you, whatever you're going to do." The victim said that the Defendant was wiping off her "bloody head," and he told the Defendant that she could not talk to the dispatcher but could talk to the police when they arrived. The Defendant again told the victim to tell the dispatcher that the victim had her pills, and the victim told the Defendant to "shut up." The victim said that he would not tell the dispatcher anything else. The Defendant again told the victim to tell the dispatcher about her pills, and the victim told her to "shut up, get out of here, or do something. Can't you see I'm trying to talk to this woman, I'm hurting?" The victim said that the Defendant had "got my gun now" and that she was "apparently crazy." The victim said that the gun's safety was engaged, and a gunshot was audible. The victim said that the Defendant had shot him again and that "You'd better hurry." Two more gunshots sounded, the first louder than the second, and a clattering sound was audible. Rustling and clattering noises continued in the background. The dispatcher repeatedly said, "Hello," but no one responded.

Morgan County Sheriff's Deputy Samuel Hamby testified that he responded to the crime scene. He said that when he arrived, Deputy Steven Harris was handcuffing the Defendant in the front yard and that no one else was present. Deputy Hamby stated that he went inside the house and found the victim lying on his back on the bathroom floor. Deputy Hamby said that the victim was deceased, that a large pool of blood surrounded the victim's head, that pink foam was around the victim's mouth, and that "some sort of a brown liquid" was on the floor. Deputy Hamby stated that he left the house, that the Defendant was sitting in the front yard, that Deputy Hamby saw a revolver and a bloodstained cloth on the ground beside the Defendant, and that the Defendant had a piece of paper in her hand. Deputy Hamby said that he collected the revolver and placed it on the trunk lid of Deputy Harris's police cruiser, that he told the Defendant to drop the

-2-

piece of paper, and that the Defendant complied. Deputy Hamby stated that he did not collect the paper. He said that the Defendant had a bleeding cut on her head. He stated that the deputies placed the Defendant in Deputy Harris's police cruiser and secured the scene. He said that Tennessee Bureau of Investigation (TBI) Special Agent Brad Nealon assisted with the case.

Agent Brad Nealon testified that when he arrived on the scene, he met with Deputy Hamby and Chief Deputy William Angel and that the Defendant was not present. Agent Nealon identified photographs of the scene, which were received as exhibits. The photographs depicted the exterior of the victim's house, drops of blood in the kitchen, the victim's body as it was found by the police, guns in the house, cartridge casings, and bullet strikes.

Agent Nealon testified that two bloodstained towels, a bloodstained shirt, and two bloodstained pieces of paper were collected from the front yard. He said that he processed the crime scene and that no weapons other than the .22-caliber revolver Deputy Hamby collected were present outside the house. Agent Nealon stated that the revolver contained four fired cartridges and two unfired cartridges and that he sent the revolver to the TBI laboratory for analysis.

The papers were received as exhibits. They consisted of ledger sheets reflecting paid and received sums of money with notations reading "doctor," "med.," "loan," and other terms.

Agent Nealon testified that inside the house, he recovered a .22-caliber semi-automatic rifle with the safety disengaged, an "older military type rifle" in the living room, which was covered in dust, several rifles in the corner of the master bedroom, and a .38-caliber revolver in a closed box in the bedroom. Agent Nealon said that drops of blood were found in the kitchen and that bloody shoe prints were found on carpet near the kitchen and in the hallway.

Agent Nealon testified that a bullet strike was found on the hallway wall, that a fired cartridge was recovered from the baseboard near the strike, and that he determined the bullet was fired toward the kitchen. He said that a second bullet strike was found on the master bedroom door and that he recovered a bullet from a nearby wall stud. He stated that a third bullet strike was found on the master bedroom wall and that a bullet was recovered from the bedroom floor. Agent Nealon said that three .22-caliber bullets and an additional fired cartridge were found inside the house. He noted that the .22-caliber rifle recovered from the house ejected spent cartridges but the revolver did not. Agent Nealon stated that a cordless telephone was found under the victim's leg and that

the telephone's cradle was located in the master bedroom. He said that he collected evidence from the medical examiner's office after the victim's autopsy.

Agent Nealon testified that he and District Attorney Investigator John Sanchez interviewed the Defendant at the police station, that she did not appear intoxicated or impaired, that she had a small cut "in the hair" with matted, dried blood, and that the Defendant was read her *Miranda* rights. A recording of the Defendant's police interview, which is not included in the appellate record, was played for the jury. Agent Nealon said that during his search of the victim's house, he did not find any Suboxone pills and that he found over-the-counter medication in a garbage can.

On cross-examination, Agent Nealon testified that the t-shirt found in the front yard belonged to the Defendant and that the t-shirt and the larger of the two towels contained a "[p]retty significant" amount of blood. When asked whether the cut on the Defendant's head was significant, Agent Nealon noted that scalp injuries bled more than most wounds and that he noticed the cut. Agent Nealon said that the bloody shoe print was not DNA tested and that as a result, he did not know from whom the blood came. He stated that all the blood collected from the house belonged to the Defendant with the exception of one swab taken from the kitchen wall, which belonged to the victim. Agent Nealon identified booking photographs of the Defendant and said that the photographs reflected the Defendant possibly had been hit under her right eye and on her left cheek. He agreed that he recovered bullets from the house on June 30 and that the house was unsecured beginning on June 25. He said that the house was released to the victim's relative before the Defendant was interviewed. Agent Nealon said that he did not note the bullet strikes in the master bedroom on June 25 and that he saw the bullet strikes when reviewing a June 25 police video recording. Agent Nealon stated that after discovering the over-the-counter medication, the police searched for any medication, but he acknowledged that he did not specifically search for Suboxone. Agent Nealon said that after the Defendant's police interview, he did not return to the house to search for Suboxone pills.

On redirect examination, Agent Nealon identified the bullet strikes on the master bedroom door and wall depicted in the June 25 police photographs. On recross-examination, Agent Nealon acknowledged that although he photographed the general location of the bullet strike on the master bedroom door on June 25, he did not recognize it as a bullet strike at the time. He said that he did not see a bullet hole on the other side of the door. When asked whether a person could have "shot right through that hole" in the bedroom door after the police left, Agent Nealon said that he did not know what happened after he left the house but that when he reviewed the photographs, "I see what I missed that day." Agent Nealon agreed that Deputy Hamby told him the revolver

-4-

recovered from the front yard contained three unfired rounds and that Agent Nealon counted two unfired rounds. Agent Nealon said that Deputy Hamby's report accounted for five total rounds in the revolver, although Deputy Hamby did not note an empty chamber.

Dr. Darinka Milusenic-Polchan, an expert in forensic pathology, testified that she conducted the victim's autopsy. She said that the victim suffered four gunshot wounds and that she recovered four bullets from the victim's body. She stated that one bullet traveled from the cheek into the neck and spine, fractured two vertebrae, damaged the spinal cord, and tore two major blood vessels. She noted that due to blood loss and the damage to the spinal cord, this shot was fatal and would have caused a rapid death. Dr. Milusenic-Polchan said that the second wound likely occurred when the victim was bent over, that the bullet traveled from the left side of the chest into the abdomen and damaged the stomach, spleen, left kidney, colon, and large bowel, and that the wound might not have been fatal. She stated that the third bullet entered the left thigh close to the groin and traveled to the left buttock and that the wound was not fatal. She said that the fourth bullet entered the back, traveled through the diaphragm, bruised the lungs, damaged the stomach, and traveled toward the rib cage, and that the wound was not fatal. She determined that the cause of death was multiple gunshot wounds, and the autopsy report reflected that the manner of death was homicide.

TBI Special Agent Alex Brodhag, an expert in firearms examinations, testified that he examined the .22-caliber rifle, the revolver, the fired cartridges, and the unfired rounds from the crime scene. Agent Brodhag noted that the revolver had a double-action trigger and that it did not eject spent cartridges. Agent Brodhag said that the fired cartridges recovered from the kitchen and the hallway had similar characteristics with markings created by the rifle but that he could not determine definitively if the cartridges were fired from the rifle. Relative to the bullets recovered from the hallway wall and bedroom floor, Agent Brodhag stated that they had similar characteristics as rounds fired from the revolver but that he could not determine definitively whether they had been fired from the revolver. Agent Brodhag said that one bullet removed from the victim's body had been fired from the revolver, that a second bullet had similar characteristics to the first bullet but could not conclusively be identified as having been fired from the revolver, and that the remaining two bullets shared characteristics with the rifle.

Frances Yvonne Reece, a correctional officer at the Morgan County jail, testified that she cleaned the Defendant's head wound, that the Defendant had two cuts on her head, that the Defendant had "a lot of dried blood" in her hair, that the Defendant had bruises on the sides of her face, and that the right-side bruise was darker than the left side. On cross-examination, Ms. Reece said that a nurse examined the Defendant the

next morning and that no further treatment was ordered. On redirect examination, Ms. Reece said that the Defendant complained of a sore jaw.

The Defendant testified that she was the victim's neighbor and that she was married with three children. She said that when she had children, she was prescribed pain medication, that after the birth of her third child, she used pain medication "quite a bit," and that by 2006 to 2008, her pain medication usage was out of control. She said that she previously had gone to a rehabilitation facility for a week and that she attended a clinic at which patients received a monthly prescription for Suboxone if they passed drug tests and kept medical appointments. The Defendant said that taking Suboxone "totally turned my life around." She said that she relied on Suboxone and that she did not fail a drug test for one year, although she quit one program, relapsed, and began attending another program. She said that the medical appointments cost $300 per month, which her insurance did not cover, and that the medication cost $40 per month.

The Defendant testified that about two years before the victim's death, the victim began stopping by her house and talking with her, that they quickly developed a romantic relationship, and that she cared about the victim. She said that although the original purpose of their relationship was sexual, they developed "a really friendly, loving relationship," that they spent time together without having sex, that they discussed books and guns, and that they loved one another. The Defendant stated that the victim wanted a bigger commitment, that she was not willing to leave her family for the victim, and that the victim became controlling.

The Defendant testified that unbeknownst to her, the victim kept a ledger book where he recorded amounts of money he spent on the victim. She said that the victim took her to medical appointments and that some of the ledger entries reflected money spent on doctor visits and medication. She stated that on the day before the victim's death, she and the victim had argued about her medication. She said that in the evening, he showed her the ledger for the first time and that she was "disturbed" and upset when she saw it because she did not know she owed the victim such a large amount of money. She said that she and the victim "agreed to settle our differences," that the victim knew the Defendant could pay her debt, and that if she had known how much she owed the victim, she would not have continued to borrow money from him.

The Defendant testified that she was angry when the victim showed her the ledger because she did not know he was keeping track of the money he spent on her and that she was unaware the victim expected to be repaid. She said the victim took her shopping and bought her children expensive gifts without having been asked. The Defendant stated

that she wanted to repay the debt and that she knew her mother and other individuals would help her repay it.

The Defendant testified that on June 23, she gave the victim her mother-in-law's gun in exchange for money to pay for her prescription. The Defendant said that she was concerned her mother-in-law or her husband would notice the gun was missing. The Defendant stated that she filled her Suboxone prescription on June 24, that she had taken three pills, and that she set aside seventeen pills for a friend, who had loaned her pills when she ran out previously. She said that she gave about eighty-three pills to the victim, that her drug program involved her being subject to "pill counts," and that if she were called in and did not have the appropriate number of pills, she would have been dismissed from the program. She stated that on June 24, the victim called and said that he wanted her pills because she owed him a lot of money. The Defendant said that every month, she took the victim some of her medication and "[bought] it back from him to get him paid back[.]" She said that after the June 24 telephone call, the victim came to her house around 4:00 p.m., that the Defendant's husband was due to arrive home soon, and that the Defendant gave the victim her medication so that he would leave. She stated that in a telephone conversation later in the evening, the victim agreed that he would give the Defendant her medication and explain to the Defendant how she could pay her debt.

The Defendant testified that she went to the victim's house around 2:00 a.m. to collect her mother-in-law's revolver and her medication, that she and the victim argued, and that she returned home. The Defendant said that she woke up at 8:00 a.m., that the victim called her and asked "if everything was still okay, if we [were] still on the same page," and that the Defendant thought the victim would give her the medication and revolver and allow her to go home.

The Defendant testified that when she arrived at the victim's house, he was angry, held the revolver, and did not have her medication. The Defendant said that the victim had not been angry when they spoke on the telephone. She said that the victim handed her one Suboxone pill and that he knew she took three or four pills per day. She said that she had not taken Suboxone since the previous night. She stated that they argued, that she asked the victim why he did not return her medication, and that he responded he needed money. The Defendant said that the victim told her, "[Y]ou might as well get comfortable, you ain't leaving right now. You're not going home today." The Defendant stated that she "started panicking" because two of her children were unattended and that she and the victim began arguing with raised voices.

The Defendant testified that the argument did not last long and that the victim yelled at her about

> how could I be so stupid, mostly. It's what he always said [about w]anting to be with my family, I guess . . . . I spent a lot of time with him . . . [b]ut it was coming to the point to where I couldn't anymore, and he knew it. I was just drawing the line.

The Defendant said that the victim refused to give her the medication, that they started "wrestling and fighting over the gun," and that the victim hit the Defendant in the neck and jaw. She stated that the Defendant gained control of the revolver, that the victim weighed 210 pounds and the Defendant weighed 120 pounds, and that the victim went toward the master bedroom. The Defendant stated that she believed the victim was going to retrieve his .38-caliber pistol and that the victim had placed the pistol to her head previously.

The Defendant testified that she had previously entered the victim's house at night, that the victim woke up, that the Defendant hid, and that the victim held his .38-caliber pistol to her head and said, "[Y]ou think I can't blow your s--- away and get away with it right now." She said that on another occasion, the victim shot a .410-caliber shotgun at the bedroom wall above where she was located and that the victim acted as though it was a game. The Defendant stated that the victim liked the power guns gave him.

The Defendant testified that she was afraid, that she shot the victim in the stomach, that he turned around came "back after me," that she shot him in the leg, and that he went into the bedroom. The Defendant said she was angry and surprised that she would have to go home without her medication and that "things weren't working the way that [the victim] promised[.]" She stated that she felt shocked after shooting him. When asked why the Defendant did not leave after gaining control of the revolver, she responded that she did not feel she "could have made it." She stated that the victim "got to me," that they struggled, and that the victim took the revolver from her. The Defendant said that "[n]othing really did faze him" and that he acted as though he had not been shot. She stated that the victim began hitting her on the head and jaw with the revolver, that the revolver caused the cuts on her head, and that the cuts left scars. She said that the blood drops throughout the house belonged to her and that she used a towel to wipe blood from her head while the victim called the police. She stated that she was not immediately aware the victim had called the police, that she did not know whether she was conscious during part of the 9-1-1 call, that she did not know "where all that time went," and that she entered the living room to look for her medication. She said that she attempted to take off her t-shirt, that the victim came into the hallway with the telephone and the revolver, that the victim grabbed the t-shirt and pushed the Defendant's head toward the ground, and that the victim held the revolver to the back of the Defendant's

head. The Defendant said that she was "[s]cared s-------," humiliated, and helpless, although she stated that she was a "survivor" and did not "back down from a fight."

The Defendant testified that she told the victim to tell the 9-1-1 dispatcher that he hit her, that the victim told her to "shut up," that she asked the victim to tell the dispatcher that the victim had her medication and that she was trying to get it back, that she wanted the police to know her version of events, and that she was angry at the victim for bullying and wanting to control her and for calling the police. The Defendant said the victim bullied her by calling her stupid and by telling the dispatcher the Defendant did not know how to disengage the safety of the .22-caliber handgun when the Defendant attempted to pull the slide back and it jammed.

The Defendant testified that the victim pointed the revolver at her while he spoke to the 9-1-1 dispatcher and that although he told the Defendant to leave, he continued to aim the revolver at her. The Defendant agreed that the victim did not shoot her and that although the victim had the opportunity to put the revolver to her head, he did not. The Defendant said that after the .22-caliber handgun jammed, she and the victim walked toward a door, that she picked up and loaded a rifle, and that she shot him. The Defendant stated that she believed the victim shot the revolver three or four times and that she was afraid, although she acknowledged that she knew at the time of the trial that the victim had not shot the revoler. She said that she was "too scared to run," that the victim had "a look in his eyes," and that she was angry the victim said she did not "have the sense enough to shoot a gun."

The Defendant testified that after she shot the victim with the rifle, he returned fire, that she shot him again, and that he fell inside the bathroom door. The Defendant said that she set down the rifle and looked inside the bedroom for her medication. She stated that she picked up the revolver, which was at the victim's feet, that she tore two pages out of the ledger book, that she was "out of [her] head," and that she grabbed the two towels she used as well as her t-shirt. She stated that she took the ledger sheets because "part of the agreement [was] to come and get it . . . and look over it, and get it taken care of . . . . Maybe I was thinking get it and the cops will never see it." She stated that she looked for the ledger before the police arrived.

The Defendant said that she did not try to run from the police, that she did not attempt to hide the revolver by wrapping it in a towel, and that she dropped everything when Deputy Harris told her to let go of the ledger sheets. She said that she did not get her medication and that she asked a TBI agent about the medication during questioning because it never occurred to her that she would be charged for the victim's death.

On cross-examination, the Defendant testified that she used Suboxone to keep away from other types of opiates, that Suboxone had "street value," that if taken correctly, Suboxone did not produce a "high," and that the only time the Defendant took Suboxone incorrectly, she became ill. The Defendant acknowledged that it was possible to abuse Suboxone but denied having abused it. She said that when she relapsed, she abused other opiates. The Defendant said that the friend with whom she exchanged pills was not abusing Suboxone, although she later admitted she or the friend might have been abusing it, and that they traded pills because they used the same medication and needed additional pills to pass a pill count or have sufficient pills to last the remainder of the month. The Defendant stated that no local doctors prescribed Suboxone. When asked why she needed to retrieve 100 pills from the victim when she had seventeen pills in her possession, she said that she had already given the seventeen pills to her friend. She acknowledged that she could have taken the pill the victim gave her and could have gone to the police station to report his refusing to return her medication.

The Defendant testified that she met with the victim at least twice a week, if not daily, and that the victim spent money on her weekly. The Defendant acknowledged that the ledger did not contain an entry for every time the victim spent money on her and said that she had not known he kept a record of any of it. The Defendant stated that she lied to Agent Nealon about her relationship with the victim because she was married and afraid her husband would discover the affair. The Defendant said that she and her husband did not share a bed, that she had left the house during the early morning hours regularly for the previous six months, and that there was a "good chance" her husband knew about the affair. The Defendant agreed that she did not call the police when the victim was outside her house because she did not want her husband to discover the affair. She said that she was "in shock" when she spoke to Agent Nealon and that Agent Nealon told her she had not been charged with a crime.

The Defendant testified that she took the ledger sheets because "that's what I [came] there for," although she acknowledged she also wanted her medication and the revolver. She said that she took the revolver from a cabinet in her mother-in-law's house and that she had gotten into trouble for pawning her family members' guns previously. The Defendant agreed that her relationship with the victim "started going south" on June 24, that the victim refused to spend more money on her, and that she wanted to "take care" of the situation by paying back the victim. The Defendant said that she and the victim had agreed the victim would return the medication and the revolver and that he and the Defendant would review the ledger book and agree on a method by which the Defendant could repay the debt. The Defendant stated that she panicked and took the ledger sheets at "the last minute." Relative to her lack of reaction to the victim's death in the 9-1-1 recording, the Defendant said that she did not realize the 9-1-1 dispatcher was

-10-

still on the line and that she had no reason for "screaming and acting like a fool." The Defendant stated that she did not know the revolver was loaded until she shot the victim. She acknowledged that the victim did not hit her with the revolver or shoot at her before she shot him. When asked how she got the revolver away from the victim given their respective size differences, the Defendant responded that the victim "got busy beating me in the head with his fists, and that's how I got the gun." The Defendant acknowledged that the victim did not retrieve the .38-caliber pistol from the box in his bedroom. The Defendant denied shooting the bedroom door and said that every shot she fired hit the victim. The Defendant stated that if she had been trying to kill the victim, the first shot would have killed him because she knew how to aim a gun.

The Defendant testified that the first time she shot the victim, he stood in the doorway to the bedroom and that the second time, he was in front of the bathroom door in the hallway. She acknowledged that the first two times she shot the victim, he was unarmed. She said that she did not blame the victim for hitting her with the revolver after she shot him and that although the victim could have shot her in self-defense and would have been justified, she was scared. The Defendant did not know where the .22-caliber pistol was if Agent Nealon did not find one in the house and said that she either threw down the gun or placed it back on the ironing board where she found it. The Defendant acknowledged that she did not report to the police the victim's holding a gun to her head or firing a gun.

The Defendant agreed that she told Agent Nealon the victim would not allow her to leave. She said that she did not leave when asked by the victim because she did not want to "let him have my back for a target." She stated that she was too afraid to "think straight enough" to back out of the house once she picked up the other gun. The Defendant acknowledged that she knew at the time of the trial that the victim had not shot at her. The Defendant said that at the time of her police interview, she was mistaken about many things. She stated that she regretted every day killing the victim and that she loved him. She acknowledged that she did not attempt to seek help for the victim and that she looked for her medication and retrieved the ledger sheets and the revolver instead. When asked whether she "took care of things" that day, the Defendant responded, "Yeah, I sure did. I took care of my whole life, my family, everything."

Upon this evidence, the jury found the Defendant guilty of first degree premeditated murder. The Defendant received a life sentence. This appeal followed.

-11-

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her first degree murder conviction and requests a new trial. The Defendant does not dispute the evidence establishing that she killed the victim. Her sole argument is that the State failed to prove beyond a reasonable doubt that she acted with premeditation. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*,

279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

Although the Defendant argues that the State did not prove premeditation because the victim was armed, she did not declare an intent to kill the victim, and she did not make preparations for or attempt to conceal the crime, these factors are non-exclusive examples of circumstances that support a finding of premeditation. Premeditation is "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). The record reflects that after an argument about the Defendant's medication, the Defendant shot the victim in the stomach and leg. The victim called the police and a minutes-long conversation between the victim and the Defendant was recorded. In the recording, the victim told the Defendant to leave. The Defendant testified that instead of leaving the victim's house, she attempted to disengage a pistol's safety and when it jammed, she picked up a rifle, loaded it, and shot the victim a third time. The victim returned fire, and she shot him a fourth time in the face, resulting in the victim's death. The Defendant testified that she was angry at the victim for calling her stupid and for telling the 9-1-1 dispatcher she did not know how to operate a gun. The jury, by its verdict, rejected the Defendant's assertion that she was trapped by the need for her medication and was too afraid of the victim to leave the house. A rational jury could have found beyond a reasonable doubt that the Defendant acted with premeditation. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-13-